FILED
03 APR 28 PM 3:38
N.D. OF DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| GINGER HANSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 02-PT-2262-E |
| ) | |
| LARRY AMERSON, ) | |
| ) | **ENTERED** |
| Defendant. ) | APR 28 2003 |

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant Larry Amerson's ("Amerson") Motion for Summary Judgment, filed on January 8, 2003.

## FACTS AND PROCEDURAL HISTORY

At all times relevant to this lawsuit, plaintiff Ginger Hanson ("Hanson") was incarcerated at the Calhoun County Jail. *See* Def. Ex. B at ¶ 3. Amerson is the Sheriff of Calhoun County. While Hanson was incarcerated, the Calhoun County Jail was managed by Administrator Bruce Barclift ("Barclift"), who reported directly to Amerson. *See* Def. Ex A at ¶¶ 6-7; Ex. B at ¶ 1. According to Amerson, Barclift was responsible for (1) monitoring and reviewing all jail operations in accordance with Amerson's written policies, procedures, and directives, and (2) overseeing all correction officers and activities in the jail. *See* Def. Ex. A at ¶ 7; Ex. B at ¶ 2. The jail's shift sergeants reported directly to Barclift, and all other staff reported directly to their respective shift sergeants. *See* Def. Ex. A at ¶ 7.

On or around November 7, 2000, Hanson began a work release program, working as a "jail worker" in the administrative office of Amerson. *See* Pl. Ex.1 at ¶¶ 5-6. Amerson contends that Hanson was never allowed to leave the jail as part of her duties. *See* Def. Ex. A at ¶ 23; Ex.

33

B at ¶ 9. Nevertheless, Hanson asserts that within two days of her beginning work, other female inmates became hostile toward her, intimidating and threatening her to use her work release status as a means of smuggling contraband into the prison. *See* Pl. Ex. 1 at ¶¶ 7-8. According to Hanson, Amerson testified that "anytime an inmate who is put in an inmate worker status who has access to the outside of the building, other inmates will always ask for them to bring contraband in." *See* Pl. Ex. 3 at 89. Hanson told the inmates that she would not smuggle contraband because it was against the rules. *See* Pl. Ex. 1 at ¶ 9. Hanson reported these incidents to officers and administrative personnel, and later told Max Kirby ("Kirby"), the chief deputy, about the incidents. *Id.* at ¶¶ 10-13. As a result of the reports, several of the female inmates "roughed up" Hanson. *Id.* Hanson reported being roughed up to two jail employees, but was told to return to her cell. *Id.* at ¶ 14. Hanson was told to beat on the door if she had any further problems. *Id.* at ¶ 15.

As soon as Hanson returned to the general prison population, the threats and intimidation resumed. *See* Pl. Ex. 1 at ¶ 16. Again, female inmates threatened Hanson to smuggle contraband into the prison, and again Hanson told Kirby. *Id.* at ¶ 17. Kirby then asked Hanson to help him catch the attempted smugglers. *Id.* at ¶ 18. As a result of the operation, Harry Edward Chenowich, the husband of one of the inmates, was arrested for attempting to smuggle contraband into the prison. *Id.* at ¶¶ 19-20; Pl. Ex. 3 at 90. Mr. Chenowich called his wife and told her that Hanson had been involved in the sting. *See* Pl. Ex. 1 at ¶ 21. Within two hours of being returned to the general prison population, Hanson was attacked by other inmates, including Mrs. Chenowich. *Id.* at ¶¶ 27-29.

Amerson and his staff took Hanson out of the general population and placed her in an

observation room. *See* Pl. Ex. 1 at ¶¶ 30-31. After the attack, Hanson alleges, she was vomiting, dizzy, and suffering from blackouts and dizzy spells. *Id.* at ¶ 32. Hanson was asked to fill out a statement that she had been attacked. *Id.* at ¶ 34. On or around November 14, 2000, Hanson was returned to the general prison population. *Id.* at ¶ 35. Ms. Hanson was again attacked by her fellow inmates, including Mrs. Chenowich *Id.* at ¶¶ 36, 41. Hanson alleges that she sustained large, visible bruises, cuts, and a serious injury to her tailbone. *Id.* at ¶ 41. Hanson felt like her ribs were broken. *Id.* Hanson suffered from severe headaches, periods of vomiting, and extreme pain. *Id.* After the second attack, Hanson was again placed in isolation. *Id.* at ¶ 42. Hanson asserts that she repeatedly asked for medical care, but did not receive such. *Id.* at ¶¶ 43-45. On or around November 16, 2000, Hanson filled out a grievance form regarding her denial of medical treatment. *Id.* Hanson alleges that, while in isolation, she was denied basic needs. Hanson was not allowed to leave her cell to use the restroom, so she had to urinate in a soda bottle. *Id.* at ¶ 46. Hanson also asserts that she was often denied heat, food, and water. *Id.* at ¶¶ 47-48. She also claims that she was attacked by two male guards. *Id.* at ¶¶ 50-51.

  Beginning with the first attack, Hanson alleges, she sent letters to her mother, Nell Jo Garner Watson ("Watson"), detailing what had happened and asking Watson to contact Amerson. *See* Pl. Ex. 2 at ¶ 4; Pl. Ex. 1 at ¶¶ 33, 52. Watson called both Amerson and Barclift on an almost daily basis seeking help for Hanson. *See* Pl. Ex. 2 at ¶ 6. Watson told Amerson that Hanson had been attacked by inmates, denied medical care and basic needs, and attacked by guards. *Id.* at ¶ 7. According to Watson, Amerson showed little sympathy for Hanson's situation. *Id.* at ¶ 8. In December 2000, Watson visited Hanson and observed that she looked dramatically thinner, badly beaten, and horribly bruised. *Id.* at ¶¶ 10-11. After the visit, Watson

3

called Amerson and told him how horrible Hanson looked. *Id.* at ¶ 12. Watson continued to call Amerson about her concerns for Hanson's safety through early January 2001. *Id.* at 15.

On or around December 29, 2000, Hanson was returned to the general prison population. *See* Pl. Ex. 1 at ¶ 55. Upon her release, Hanson was attacked a third time by her fellow inmates. *Id.* at ¶ 58. On or about January 4, 2001, Hanson was released from the Calhoun County Jail, eight months before her sentence was to end. *Id.* at ¶ 59.

Amerson disputes that these events occurred. *See, e.g.,* Def. Ex. B at ¶ 8. He also asserts that even if these events did occur, they were contrary to the written policies and procedures that he instituted for the jail. *See* Def. Ex. A at ¶ 3; Ex. B at ¶ 5.[1] All jail personnel are required to comply with these directives, and any violation results in employee discipline, including reprimand, suspension, or dismissal. *See* Def. Ex. A at ¶¶ 3-4. According to Amerson, these policies show that he did not tolerate the kinds of events alleged by Hanson, and that he has tried to prevent such instances from occurring.

Specifically, Amerson cites Directive CCJ-32, entitled "Enemies List." This directive is designed to make sure that no inmate is placed in the same housing unit with others who might do her harm based on a preexisting conflict. *See* Def. Ex. A at ¶ 9. At booking, all inmates are given the opportunity to complete an "enemies list" of other inmates whom the inmate fears might cause her harm. *Id.* If an inmate makes a list, the concerns are honored, and the list is placed in the inmate's file. *Id.* If "new" enemies are made, the list is updated. *See* Def. Ex. B at ¶ 6. Jail personnel are trained to report threats to Barclift, because it is jail policy to separate inmates who have become enemies. *Id.* at ¶¶ 7, 10.

---

[1] Copies of these policies are attached to Def. Ex. A.

Amerson also cites Directive CCJ-40, which ensures that appropriate security will be provided for all inmates, staff, and visitors. *See* Def. Ex. A at ¶ 13. Directive CCJ-41 requires jail officials to supervise all inmates in a manner designed to provide security and orderly operation of the jail. *Id.* at ¶ 14. The jail has over fifty (50) monitoring cameras to assist in this effort. *Id.* at ¶ 22. Directive CCJ-61 requires jail officials to make every effort to protect inmates' security. *Id.* at ¶ 15. Directive CCJ-61 also requires jail officials to take seriously any claim by any inmate that his or her basic rights are being violated. *Id.* Finally, Amerson cites Directives CCJ-66, CCJ-67, and CCJ-69, which set forth the jail's inmate disciplinary procedures. *Id.* at ¶¶ 16-19.

Amerson asserts that there was only one incident report in Hanson's jail file, and that this was a verbal incident occurring between Hanson and two other female inmates on November 18, 2000. *See* Def. Ex. A at ¶¶ 2, 18; Ex. B at ¶¶ 5, 8. According to the report, there was no physical altercation, and no indication that Hanson was physically harmed or injured. *Id.*[2] This incident was so isolated that Barclift did not even report it to Amerson. *See* Def. Ex. B at ¶ 7. Amerson also notes that inmates always have access to pen and paper in order to report grievances, and that the jail has formal grievance procedures. *See* Def. Ex. A at ¶ 12; Ex. B at ¶¶ 9, 6. Also, because of her position as a jail worker, Hanson had several opportunities to voice any complaints to Barclift or Amerson directly. *See* Def. Ex. A at ¶ 23; Ex. B at ¶ 9. Despite these opportunities, Hanson never made an enemies list or filed any grievances. *See* Def. Ex. A at ¶¶ 10, 12, 18, 23; Ex. B at ¶ 6. Amerson contends that he had no knowledge that there were any ongoing problems of officials not reporting incidents or potential threats against inmates.

---

[2]However, the report apparently indicates some yelling and potential acts of violence against Hanson. *See* Def. Ex. B at ¶ 5.

5

*See* Def. Ex. A at ¶ 21; Ex. B at ¶ 7. If such reports had been made, Amerson contends, measures would have been taken and the incidents would have been investigated. *See* Def. Ex. A at ¶ 24; Ex. B at ¶¶ 8, 10.[3]

As to Hanson's claims of not receiving medical care, Amerson notes that Directive CCJ-89 requires jail officials to provide inmates with access to appropriate healthcare services. *See* Def. Ex. A at ¶ 20. All jail officers receive forty (40) hours of basic training, forty (40) hours of medical training, and eighty (80) hours of jail management training. *Id.* at ¶ 21. Inmates who do not suffer from obvious physical ailments must fill out a request for medical evaluation form, and they will then receive medical attention. *Id.* at ¶ 20. Amerson contends that Hanson's file has no records showing that she was ever injured or that she requested medical assistance for any injuries that she received while incarcerated. *See* Def. Ex. A at ¶ 20; Ex. B at ¶ 4.

Hanson filed this complaint on September 12, 2002. In the complaint, she alleges violations of the Eighth and Fourteenth Amendments against Amerson, as well as Calhoun County and the Calhoun County Commission. Calhoun County and the Calhoun County Commission were dismissed by court order on December 2, 2002. Amerson now seeks summary judgment on the claims alleged against him.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is

---

[3] By contrast, Hanson notes that Amerson testified that complaints at the jail are routine, that he personally rarely documents complaints because there are so many, that he does not "have enough hours in the day to read them all," and that he does not trust or believe the inmates. *See* Pl. Ex. 3 at 42-46, 64-68, 86; Pl. Br. at 1-2.

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Defendant's Position

First,[4] Amerson contends that any claims based upon the Fourteenth Amendment are due to be dismissed, because Hanson was a convicted prisoner, not a pretrial detainee. According to Amerson, the Eighth Amendment applies to the former, while the Fourteenth Amendment applies to the latter. *See Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1539 n.3 (11th Cir. 1994).[5] Amerson also argues that a "substantive due process" argument under the Fourteenth Amendment should be rejected as well. According to Amerson, when a particular Amendment "provides an explicit textual source of constitutional protection . . . that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing" such a claim. *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citations omitted). Here, Amerson contends, that Amendment is the Eighth Amendment.

Amerson also argues that any Eighth Amendment claims must be dismissed. Amerson notes that the Eighth Amendment is implicated when a prison official is deliberately indifferent to a substantial risk of serious harm to inmates. *See Marsh v. Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2001)(en banc). Here, Amerson asserts, Hanson is alleging two distinct types of

---

[4]Amerson also argues that he cannot be sued in his "official capacity" and that any First Amendment claims should be dismissed. *See* Def. Br. at 9-10, 12-13. Hanson specifically states that she is not suing Amerson in his official capacity, and that she is not making any First Amendment claims. *See* Pl. Br. at 9 n.60. Any such claims will be dismissed.

[5]Amerson notes however, that the Eleventh Circuit has held that the standard for providing basic human needs to those incarcerated or in detention is the same under the Eighth and Fourteenth Amendments. *See Lancaster v. Monroe City*, 116 F.3d 1419, 1425 n.6 (11th Cir. 1997); *Hamm v. DeKalb City*, 774 F.2d 1567, 1573-74 (11th Cir. 1985). This issue is not very significant except academically. Presumably, even an Eighth Amendment claim has to be brought pursuant to the Fourteenth Amendment. It would just not be a "due process" claim.

violations: inmate-on-inmate violence, and denial of medical necessities.[6] However, Amerson notes, not every injury suffered by an inmate is actionable. Amerson cites *Zatler v. Wainwright*, 802 F.2d 397 (11th Cir. 1986), in which the court stated that

> [I]t is well settled that a prison inmate has a constitutional right to be protected from the constant threat of violence and from physical assault by other inmates. *Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir.1981). *See also Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir.1984)(per curiam); *Jones v. Diamond*, 636 F.2d 1364, 1373 (5th Cir.1981)(en banc). However, "[t]his does not mean that the constitutional rights of inmates are violated every time a prisoner is injured. It would not be reasonable to impose such an absolute and clearly unworkable responsibility on prison officials." *Gullatte*, 654 F.2d at 1012. "'In order to state a § 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to constitutional stature.'" *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir.1982)(*quoting Wright v. El Paso County Jail*, 642 F.2d 134, 136 (5th Cir.1981), *cert. denied*, 464 U.S. 932, 104 S. Ct. 335, 78 L. Ed.2d 305 (1983)). *See also Martin v. White*, 742 F.2d 469, 474 (8th Cir.1984)( "[P]rison officials may be liable where they are 'deliberately indifferent to [a prisoner's] constitutional rights, either because they actually intended to deprive him of some right, or because they acted with reckless disregard of his right to be free from violent attacks by fellow inmates.'")(*quoting Branchcomb v. Brewer*, 669 F.2d 1297, 1298 (8th Cir.1982)).

*Id.* at 400-01. Similarly, Amerson argues, not every denial of medical attention is actionable. Amerson cites *Estelle v. Gamble*, 429 U.S. 97 (1976), in which the Supreme Court stated that

> [A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Id.* at 106. Thus, Amerson argues, in order to establish a cause of action under the Eighth

---

[6]Amerson asserts that any claims based on Hanson being attacked by prison officials should be dismissed. *See* Def. Br. at 13 n.5. Apparently, no such claim is pursued by Hanson.

Amendment, Hanson must show (1) that she suffered an Eighth Amendment deprivation, (2) by a person acting under color of law, and (3) causation between the unconstitutional conduct and her injuries and/or damages. *See Dollar v. Haralson County*, 704 F.2d 1540, 1542-43 (11th Cir. 1983); *see also Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir. 1995). Here, Amerson contends, he was not deliberately indifferent to Hanson's Eighth Amendment rights, there is no evidence of causation, and even if there was, he is entitled to qualified immunity.

First, Amerson contends that he was not deliberately indifferent.[7] According to Amerson, deliberate indifference lies somewhere between negligence and willful conduct, and is thus fairly equivalent to recklessness or wantonness. *See Smith v. Wade*, 461 U.S. 30, 39-40 n.8 (1983)(defining wantonness). Amerson contends that in order to prove deliberate indifference, Hanson must show (1) that there was an objectively substantial risk of harm, (2) that Amerson was subjectively aware of the risk, and (3) that Amerson reacted to this risk in an objectively unreasonable manner. *See Farmer v. Brennan*, 511 U.S. 825, 843-45 (1994). Amerson contends that, because inmate safety must be balanced with competing penological goals, only an unjustified, constant, and unreasonable exposure to violence creates an objectively substantial risk of harm. *See, e.g., LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993). Here, the evidence shows that Hanson was involved in only one incident, and that the incident was verbal in nature. Moreover, Hanson never took advantage of any of the avenues available to her to be protected,

---

[7]Amerson argues that he can be liable under § 1983 if either (1) he was personally involved in the acts or omissions that resulted in the constitutional deprivation, and/or (2) his jail policies were deliberately indifferent and caused jail employees to violate an inmate's constitutional rights. *See Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir. 1995). Here, Amerson contends, there is no evidence of direct involvement.

suggesting that she herself did not believe she was in danger.[8] Amerson also asserts that there is no evidence that Hanson suffered from a substantial risk of harm as a result of a serious medical need.

Amerson also contends that there is no evidence that he was subjectively aware of any risk to Hanson. To satisfy this prong, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Here, Amerson notes, he was not notified of any threat to Hanson, and no written document exists where Hanson or a jail official noted a possible threat. While it is true that "failure to give advance notice [of an attack] is not dispositive," and that "an official may not escape liability merely by showing that he did not know the claimant was likely to be assaulted or that an assault would be committed by the specific prisoner who eventually committed the assault," a defendant still must have some "subjective knowledge of a generalized, substantial risk of serious harm from inmate violence." *Hale*, 50 F.3d at 1583 (citations omitted).[9] Similarly, Amerson argues, Hanson has failed to show that he knew "that an inmate [was] in serious need of medical care, but [failed] or [refused] to obtain medical treatment for the inmate." *Lancaster*, 116 F.3d at 1425.

Finally, Amerson argues, the jail policies covered all of the potential risks at the jail in an objectively reasonable manner. According to Amerson, this element requires that Hanson show that Amerson knowingly or recklessly "disregard[ed] that risk by failing to take reasonable

---

[8] Amerson argues that this case is very different from the few cases in which the Eleventh Circuit has found liability. *See* Def. Br. at 18-19 (discussing cases).

[9] Again, Amerson compares this case to cases in which the Eleventh Circuit has found a violation. *See* Def. Br. at 20-21.

measures to abate it." *Hale*, 50 F.3d at 1583 (citations omitted). Amerson contends that if a prison official endeavors to remedy a deficient prison condition, but fails to do so, he can be deliberately indifferent only if he knows, but disregards, an appropriate and sufficient alternative. *See LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993). *See also Farmer*, 511 U.S. at 844-45. Here, Amerson's policies established rigid rules that protect inmates from violent attacks and ensure that they get needed medical care. Thus, even assuming Hanson's rights were violated, Amerson himself cannot be held responsible.

Second, Amerson argues that even if he was deliberately indifferent, Hanson has failed to establish causation. According to Amerson, Hanson must show that his policies and/or customs were the proximate cause or "moving force" of the violation of her Eighth Amendment rights. *See Hale*, 50 F.3d at 1582. In other words, Hanson must prove that there is a direct causal link between the policy or custom and the alleged constitutional deprivation. *See City of Canton v. Harris*, 489 U.S. 378, 391 (1989). As the Fourth Circuit has stated, "Proof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but- for' causation-in-fact." *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987). Here, Amerson argues, Hanson has provided no evidence that any unconstitutional policy caused her constitutional injury.[10]

Lastly, Amerson argues, he is entitled to qualified immunity. Amerson notes that the Eleventh Circuit has specifically held that Alabama sheriffs are entitled to qualified immunity. *See Marsh*, 268 F.3d at 1028-30. As stated in *Marsh*,

---

[10]Amerson argues that this case is similar to *Law v. Tillman*, No. CV-98-00781-BH-L (S.D. Ala. Jan. 8, 2001), which he has attached to his brief. *See* Def. Br. at 24.

A government-officer defendant is entitled to qualified immunity unless, at the time of the incident, the "preexisting law dictates, that is, truly compel[s]," the conclusion for all reasonable, similarly situated public officials that what Defendant was doing violated Plaintiffs' federal rights in the circumstances.

When looking at the preexisting case law, courts, dealing with qualified immunity defenses, must always keep in mind the great distinction between following a precedent and extending a precedent. Two sets of circumstances may be "nearly" the same, but "nearly" can make a great legal difference at the edge. Because fair and clear notice to government officials is the cornerstone of qualified immunity, courts must diligently analyze the preexisting case law to determine whether it really did provide plain notice to every reasonable government official that the pertinent conduct, in the specific circumstances, would clearly violate preexisting federal law.

The deliberate indifference standard of the Eighth Amendment basically places a duty on jailers to act reasonably to keep inmates safe. A "duty-to-act-reasonably" standard, by itself, is almost always too general a proposition to give meaningful notice to a public official that what he, in the specific circumstances, is doing violates established federal law.

When the facts of previous precedents are necessary to give clear warning that certain conduct in specific circumstances will violate federal law, we must look at the facts in the precedent and at the facts that confronted the government official in the case before the court. The two sets of facts must be materially similar. For qualified immunity purposes, a preexisting precedent is materially similar to the circumstances facing an official when the specific circumstances facing the official are enough like the facts in the precedent that no reasonable, similarly-situated official could believe that the factual differences between the precedent and the circumstances facing the official might make a difference to the conclusion about whether the official's conduct was lawful or unlawful, in the light of the precedent. Thus, every fact need not be identical. But minor variations in some facts (the precedent lacks an arguably significant fact or contains an additional arguably significant fact not in the circumstances now facing the official) might be very important and, therefore, be able to make the circumstances facing an official materially different from the preexisting precedents, leaving the law applicable--in the circumstances facing the official--not clearly established when the defendant official acted.

To apply properly this "materially similar" principle, the court, surveying the relevant area of law, must discern the facts that were material to the federal law violation in similar preexisting cases. These facts then must be compared to the facts alleged in the case before the court. If there is an absence of a fact (or the presence of an additional fact) in the case before the court, the court must

> determine whether that fact might make a difference to any reasonable official who had to determine whether his conduct violated federal law in the circumstances in the immediate case. If the court determines that the variance might make a difference, the precedent--when factual particularity is needed to establish the law--cannot clearly establish the law applicable to the circumstances facing the defendant.

*Id.* at 1030-33 (footnotes and citations omitted). Here, Amerson contends, there is no Supreme Court, Eleventh Circuit, or Alabama Supreme Court case in existence that holds that policies similar to Amerson's are unconstitutional. Thus, he is entitled to qualified immunity.

**II. Plaintiff's Response**

Hanson argues that in order to establish a violation of the Eighth Amendment, she must show (1) a condition of confinement that inflicted unnecessary pain or suffering, (2) the defendant's deliberate indifference to that condition, and (3) causation. *See LaMarca*, 995 F.2d at 1535. According to Hanson, whether a particular condition constitutes cruel and unusual punishment is an objective inquiry, while whether the defendant was deliberately indifferent is a subjective inquiry. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

Hanson notes that prison conditions result in cruel and unusual punishment only when they amount to an "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). However, Hanson notes, jail officials must provide "reasonably adequate" food, clothing, shelter, and sanitation. *See Newman v. Alabama*, 559 F.2d 283, 286 (5th Cir. 1977). Here, Hanson contends, she was not allowed out of her cell to use the restroom, forcing her to urinate in a soda bottle. She also was denied meals, heat, and water. Thus, Hanson argues, there was an Eighth Amendment violation.

Hanson also argues that an Eighth Amendment violation occurred because she was denied adequate medical care. Hanson asserts that she must show (1) that she suffered from an

14

obvious medical need, (2) that she made reasonable requests for treatment, and (3) that there was a substantial potential for harm if medical care was delayed. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985). Here, Hanson contends, she suffered large, visible bruises, cuts, and an injury to her tailbone after being beaten by the other inmates. She asked for care, but was denied it. The nature of her injuries suggested that there was a substantial risk of harm if her injuries were not treated. Thus, Hanson argues, her Eighth Amendment rights were violated in this respect as well.

Finally, Hanson contends that her Eighth Amendment rights were violated because Amerson failed to guarantee her safety. The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). Thus, a prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment. *See Helling v. McKinney*, 509 U.S. 25 (1993). However, Hanson notes, "the very high state of mind prescribed by *Whitley* does not apply to prison conditions cases." *Seiter*, 501 U.S. at 302-03. Rather, Hanson argues, she need only show a state of mind routinely equated with recklessness. *See, e.g., LaMarca*, 995 F.2d at 1535; *Manarite v. Springfield*, 957 F.2d 953, 957 (1st Cir. 1992); *Redman v. County of San Diego*, 942 F.2d 1435, 1443 (9th Cir. 1991). Here, Hanson argues, under the facts that she has alleged, Amerson knew or had reason to know that she was at risk and was not safe. Even if Amerson did not, Hanson contends, the responsibility still falls on him. Amerson is the one who chose not to be informed of every incident or to read every complaint, and it was Amerson who testified that he does not trust inmates.[11]

---

[11] This court does not conclude that Amerson had a duty to personally read every complaint.

15

Hanson also argues that her Fourteenth Amendment rights were violated. Hanson agrees that the *Tittle* case stands for the proposition that the Eighth Amendment does not apply to pretrial detainees. However, she disputes that *Tittle* also holds that the Fourteenth Amendment does not apply to convicted prisoners. Rather, Hanson asserts, courts regard Fourteenth and Eighth Amendment claims as coterminous because both Amendments provide the same type of protection to a convicted inmate. *See, e.g., Moreland v. Dorsey*, 230 F. Supp. 2d 1338, 1344 (N.D. Ga. 2002), *citing Whitley v. Albers*, 475 U.S. 312, 327 (1986).[12]

Hanson argues that the case *White v. Lemacks*, 183 F.3d 1253 (11th Cir. 1999), is illustrative. In *White*, Hanson contends, the Eleventh Circuit discussed the "special relationship" theory that could give rise to a Fourteenth Amendment claim. Specifically, the court stated that

> [I]t appears the only relationships that automatically give rise to a governmental duty to protect individuals from harm by third parties under the substantive due process clause are custodial relationships, such as those which arise from the incarceration of prisoners or other forms of involuntary confinement through which the government deprives individuals of their liberty and thus of their ability to take care of themselves.

*Id.* at 1257. According to Hanson, this "special relationship" discussed in *White* would apply to her situation, and the facts as alleged show that Amerson disregarded his special duty to Hanson.[13]

---

[12] In *Whitley*, the Supreme Court did state that "[w]e think the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one, where the deliberate use of force is challenged as excessive and unjustified. It would indeed be surprising if, in the context of forceful prison security measures, 'conduct that shocks the conscience' or 'afford[s] brutality the cloak of law,' and so violates the Fourteenth Amendment, were not also punishment 'inconsistent with contemporary standards of decency and 'repugnant to the conscience of mankind,' in violation of the Eighth." *Id.* at 327 (citations omitted).

[13] Anticipating Hanson's position, Amerson argues that *White* did not create additional constitutional rights for prison inmates; rather, the quoted language was referring to scenarios not covered by the Eighth Amendment, such as pretrial detainees and person confined to mental institutions. *See* Def. Br. at 11-12. Hanson counters that the language in *White* applies to all custodial situations. *See* Pl. Br. at 20.

16

As for causation, Hanson notes that at the summary judgment stage, Amerson must prove that there is dispute as to causation. He cannot simply argue that Hanson has not carried her burden. *See Smith v. BellSouth Telecomms., Inc.*, No. CV-99-H-1720-S, 2000 U.S. Dist. LEXIS 15700, at *3 (N.D. Ala. Oct. 24, 2000). Moreover, Hanson argues, she can meet her burden of showing a causal connection. The facts as alleged show that Amerson was or should have been aware of the danger that Hanson was in, yet he chose to put her back into the general population anyway, not once, but three times. These facts, Hanson argues, establish proximate cause.

Finally, Hanson argues, Amerson is not entitled to qualified immunity. After discussing the general law of qualified immunity, Hanson argues that Amerson violated her clearly established constitutional rights. "When officials are aware of a danger to an inmate's health and safety . . . it does violate the constitutional proscription against cruel and unusual punishment to fail to afford that inmate reasonable protection." *Gullatte v. Potts*, 654 F.2d 1007, 1012 (5th Cir. 1981). Here, Hanson was denied food, heat, and water, and was placed in a situation that resulted in her being assaulted on several occasions. Hanson's "rights were so sufficiently clear that a reasonable government officer would have understood that his actions were constitutionally repugnant." *Dorsey v. Wallace*, 134 F. Supp. 2d 1364, 1370-71 (N.D. Ga. 2000).

Hanson also addresses Amerson's arguments concerning the policies that were in effect at the jail. First, she argues that no reasonable officer could believe that an inmate who cooperated in the arrest of another inmate's spouse would be safe in the general population. Second, the evidence shows that Amerson failed to adhere to his own policies. Hanson's "enemies" list never included her attackers, even though she was attacked on more than one

occasion. Third, the evidence suggests that Amerson failed to adequately supervise his staff on policies and procedures. Hanson contends that supervisors may be liable for failing to train and supervise their employees:

> [Supervisory] liability under section 1983 "must be based on something more than a theory of *respondeat superior*. Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so."

*Dolihite v. Maughon*, 74 F.3d 1027, 1052 (11th Cir. 1996)(citations omitted). Here, Amerson testified that he received inmate complaints all the time and that there was not enough hours in the day to read them all. Amerson testified that he thought that all inmates were dishonest. Finally, there was a history of Hanson being assaulted by a group of inmates. Hanson contends that Amerson's actions (or inactions) are not protected by the doctrine of qualified immunity.

## CONCLUSIONS OF THE COURT

The law in these areas is relatively well established. The real issue is whether Amerson personally knew or was advised of danger to the plaintiff and/or personally knew or was advised that she was in need of medical treatment and was, thereafter, personally deliberately indifferent to the danger or needs. The court cannot make credibility determinations. The factual issues may be close, but the court cannot determine that there is no genuine issue as to material facts. The motion will be granted in part and denied in part.

This _____ day of April, 2003.

/s/ Robert B. Propst
**ROBERT B. PROPST**
**SENIOR UNITED STATES DISTRICT JUDGE**